UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN J. BYRNE and BARBARA BYRNE, | |
| Plaintiffs, | CIVIL ACTION NO.: 3:05-cv-00466 |
| v. | |
| SALOMON SMITH BARNEY, INC., | JURY TRIAL DEMANDED |
| Defendant | |

## AMENDED COMPLAINT

The Plaintiffs, John J. Byrne and Barbara Byrne, by and through their legal counsel, the Law Firm of Byrne, Neyhart & Higgins, hereby file this Civil Action Complaint against the Defendant, Salomon, Smith, Barney, Inc. and allege the following:

1. The Plaintiffs, John J. Byrne, and Barbara Byrne are adult individuals who reside at 509 Thomas Drive in the Borough of Dunmore, Lackawanna County, Pennsylvania

2. The Defendant, Salomon, Smith, Barney, Inc., is a Delaware Corporation with its principle place of business at 388 Greenwich Street, New York, New York, 10013. Defendant maintains offices located at 528 Spruce Street, Suite 200, Scranton, Lackawanna County, Pennsylvania.

3. The Lackawanna County Court has jurisdiction over this Defendant pursuant to 42 P.S.§ 5301 (a)(2) and 5322 because the Defendant continuously and systematically conducts,

transacts and engages in business within the Commonwealth of Pennsylvania, operating either directly or through it's various investment offices throughout the Commonwealth and offering investment services to thousands of customers within the Commonwealth.

4. The Lackawanna County Court has subject matter jurisdiction over this action pursuant to 42 P.S. § 931.

5. Venue in the Lackawanna County Court is proper under Pennsylvania Rules of Civil Procedure 1006 and 2179 because inter alia Defendant regularly conducts business in Lackawanna County, serving thousands of customers during the pertinent time period at various investment offices and via mail and telephone.

## FACTS

6. The Defendant is one of the world's largest investment banking and stock brokerage firms with assets exceeding $300,000,000,000.00 (Three hundred billion dollars).

7. The Defendant is a global full service financial firm which provides brokerage investment banking and asset management services to corporations, governments, individuals and institutions. The Defendant's brokerage operations include management of millions of investment accounts including, during the pertinent period of time, the plaintiffs' account.

8. Through a multi-million dollar marketing campaign, the Defendant repeatedly represents that its retail brokerage customers are in the best possible hands and Defendant repeatedly assures current and potential customers of its strong work ethic and its commitment to building relationships based upon trust and professionalism. The Defendant promises consumers that all of its investment experience, capabilities and resources are focused on one objective- to help you invest wisely.

9. On, before and after November 15, 2000, the Defendant, through it's agent, Scott V. Hartshorn, engaged in a concerted solicitation of the Plaintiffs with the intent of having the Defendant manage all of the Plaintiffs' assets. The Defendant advised the Plaintiffs' that the Defendant would professionally manage the Plaintiffs' portfolio and make their everyday decisions and that their portfolio managers could adjust to changing market conditions, had extensive economic and investment research capabilities that lead the industry which included a personal rapport with major corporate officers and that they could provide suitable managers during unpredictable markets.

10. The Defendant's agent specifically advised the Plaintiffs' that they would have an individual manager handling each aspect of their portfolio with no commingling of funds.

11. The Defendant, through its agent, Hartshorn, informed the Plaintiffs' that he would arrange for a personal meeting with their individual portfolio managers at the Executive Dining Room of the Defendant's New York office in the World Trade Center. The Defendant did arrange to pick up the Plaintiffs' in a limousine, transport them to the World Trade Center, and meet with the individual managers who were to professionally and individually manage the Plaintiffs' account.

12. It was agreed between the Plaintiffs and the Defendant that the Plaintiffs would transfer substantial portions of the Plaintiffs' assets to Salomon, Smith, Barney and that Salomon, Smith , Barney would manage the Plaintiffs' funds in the following manner:

   a. 25% of the funds that were invested in stocks were to be managed by Richard Freeman.

   b. 35% of the funds that were invested in stocks were to be managed by Larry

    Weissman.

  c. 40% of the funds that were invested in stocks were to be managed by Hirsch Cohen.

  d. It was on the personal representation that these professional managers would individually manage the plaintiffs' account that the Plaintiffs' placed these funds and securities with Salomon, Smith, Barney in February of 2001.

13. At the time that Mr. Hartshorn was soliciting the Plaintiffs' business, Salomon, Smith, Barney knew that Mr. Hartshorn did not have five years of experience in the securities business, that Mr. Hartshorn had not passed his Series 65 exam demonstrating the necessary competence in helping individuals in evaluating and selecting money managers, in violation of Salomon, Smith, Barney's own regulations.

14. Mr. Hartshorn, who was not qualified by the Defendant's own standards, engaged in various efforts to direct and manage the assets in the Plaintiffs' account, inconsistent with the agreement between the Plaintiffs and the Defendant, Salomon, Smith, Barney.

15. In an effort to disguise the involvement of the unqualified and inexperienced Mr. Hartshorn, the Defendant did, without the Plaintiffs' knowledge or consent, assign one Robert Vinskovsky as an account executive on the Plaintiffs' account. The Plaintiffs had never met nor even spoken to Mr. Vinskovsky and the Plaintiffs were unaware of any relationship that may have existed between Mr. Hartshorn and Mr. Vinskovsky and the Defendant. At no time did the Defendant advise the Plaintiffs that Mr. Vinskovsky had been the subject of customer complaints to the N.A.S.D., including complaints about unauthorized trading and failure to follow instructions, unauthorized exercise of discretion and recommending unsuitable securities, and a complaint that the client was unaware that he purchased a variable annuity and

was under the impression that it was a living and death benefit.

16. In the Spring of 2001 the Plaintiffs became concerned about the management of their account because a substantial portion of their account, which was in cash, was converted to stock on one particular day. Furthermore, there appeared to be no effort to remove securities from the account which were not performing and decreasing substantially in value.

17. The Plaintiffs were receiving statement from the Defendant which simply listed stocks in the Plaintiffs' account without designating or referring to the individual managers who were overseeing the investments in these particular stocks.

18. The Plaintiffs contacted the Defendant, in particular Mr. Hartshorn, requesting a breakdown in the account to determine how each of the individual managers were performing and how much each manager had remaining in cash for investment purposes. Mr. Harshorn would verbally recite figures over the phone, comment about the cash involved and comment about the individual stocks which he said the managers had in the account.

19. Mr. Hartshorn repeatedly advised the Plaintiffs that all of the investment decisions were being made by their individual managers in New York and went on to arrange for various conference calls between the individual managers and the Plaintiffs, where the managers spoke about the positive attitude they had for the stocks they selected and for the market outlook. The managers literally addressed specific concerns of the Plaintiffs over the phone and, unbeknownst to the plaintiffs, these managers were not handling the plaintiffs' assets.

20. Mr. Hartshorn further relayed information directly from the individual managers to the Plaintiffs, advising the Plaintiffs of the very bullish attitude of the Plaintiffs' managers and their very selective approach to the market.

21. Despite the numerous reassurances by Mr. Hartshorn about the individual managers

handling the Plaintiffs' assets, the Plaintiffs' continued to be concerned because the received statements identified only the securities held by Salomon, Smith, Barney and not the designated managers and the portion of the assets they were managing.

22. In July of 2001, the Plaintiff, John J. Byrne, concerned about the management of the account, went to the Salomon, Smith, Barney office and encountered for the first time, Mr. Vinskovsky. The Plaintiff was unable to locate or confront Mr. Hartshorn. The Plaintiff asked Mr. Vinskovsky for a breakdown of the individual manager's performance. Mr. Vinskovsky was completely confused by the circumstances and called the New York office for advise on the account. Vinskovsky then advised the Plaintiff that he was in a large cap growth account. At this point the Plaintiff became greatly concerned and contacted the manager of the office.

23. The manager advised the Plaintiff that he then confronted both Mr. Vinskovsky and Mr. Hartshorn who advised he, the manager, that I was in a "personalized portfolio".

24. Mr. Vinskovsky then appeared in the Plaintiffs' office with a list of plaintiffs' holdings and a handwritten designation that 40% of their stocks were being managed by John Good and Chad Greaves, 35% were being managed by Larry Weissman and 25% of the stock was being managed by Richie Freeman. The Plaintiff advised Mr. Vinskovsky that he expects a formal printed list of the securities, their value and the managers responsible for managing those securities. Mr. Vinskovsky said he would provide this to the Plaintiffs as soon as possible.

25. The value of the account continued to deteriorate with virtually no apparent act of management. The Defendant's agent continued to avoid providing the plaintiffs' with the requested information in the management of their account.

26. On August 31, the Plaintiff again appeared in the office of Salomon, Smith, Barney

and expressed grave concern about the negative volatility in the account. The Plaintiff requested that they liquidate the account. Messieurs Vinskovsky and Hartshorn assured the Plaintiffs that securities in the account were of such a quality that they would inevitably increase in value in the short term and that "New York" instructed them not to sell the securities.

27. On September 8, 2001, the Plaintiff again appeared in the Defendant's office extremely concerned and upset about the progress of the account, again the Defendant's agents reassured the Plaintiff that the value of the account would go up and, indeed, Mr. Vinskovsky suggested that he would buy the account if he had the money, that New York was instructing that the account stay in securities and directing the Plaintiffs not to turn the account into cash.

28. The Plaintiffs continually contacted the Defendant's agents between September 11, 2001 to September 14, 2001 and the Defendant's agents continually reassured the Plaintiffs' that the equity in the account would be up by the end of the week.

29. On September 18, 2001 the Plaintiffs contacted Scott Hartshorn and advised him that the minute the market turned down the securities should be converted to cash. The market turned down, they weren't converted to cash and on September 19, 2001, the Plaintiffs' adamantly instructed Mr. Hartshorn to turn all of their account securities into cash.

30. The Plaintiffs continued to pursue a breakdown of the account to determine which holdings were being managed by what individual managers, who was responsible for the stock selection and to analyze the progress of the performance. Mr. Vinskovsky, in another deceitful effort to try and comply with these requests, provided the Plaintiffs' with a cryptic response. In this same correspondence the Defendant's agent, Vinskovsky, terminated his relationship with the Plaintiffs.

31. The Plaintiffs' continued to press Salomon, Smith, Barney for a breakdown indicating which of the listed securities owned by the Plaintiffs were being managed by which of the individual managers requested by the Plaintiffs, to wit; Larry Weissman, Richard Freeman, and Hirsch Cohen. In October of 2001, the Plaintiffs again received a list of their securities with initials designating the specific managers who were to be handling specific stocks on behalf of the Plaintiffs.

32. This cryptic effort to respond to the Plaintiffs' request made it obvious that the Defendant never complied with their agreement on the allocation of the asset to specifically individual managed portfolios and engaged in a concerted effort of fraud, deceit and misrepresentation.

33. To this date the Plaintiffs have no idea who was managing their funds nor how the funds were being managed. The Plaintiffs never would have placed their assets with Salomon, Smith, Barney without specific agreement on the management of their assets by the three previously mentioned managers.

**FIRST CAUSE OF ACTION**

**SECURITIES FRAUD AGAINST THE DEFENDANT**

34. The Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 33 above as if fully set forth herein .

35. The Defendant, Salomon, Smith Barney by the use and means of instrumentalities of interstate commerce and of the mails, directly or indirectly, and knowingly or with reckless disregard in connection with the purchase or sale of securities, committed the following acts:

   a. Employed a divisive scheme and artifice to defraud

   b. Obtained money and property by means of untrue statements of material facts and of omissions to state material facts necessary in order to make the statements made in light of the circumstances under which they were made misleading the Plaintiffs and

   c. Engaged in transactions, practices, and a course of conduct which operated as a fraud and deceit on the Plaintiffs all with reference to the facts, acts and omissions set forth in Paragraphs 1 through 33.

36. The Defendant took possession of the Plaintiffs' assets in excess of 1.2 million dollars and failed to disclose timely or otherwise what they were doing with the assets and knowingly deceived the Plaintiffs, making false misrepresentations as to the individuals handling the portfolio and the allocation of the assets within the portfolio.

37. The Defendant, with intent to deceive and defraud the Plaintiffs, made false representations as to the individuals handling the portfolio and the allocation of the Plaintiffs' assets for purposes of taking unwarranted fees and manipulating the Plaintiffs' assets.

38. The Plaintiffs' would never have placed their assets in the hands of Salomon, Smith, Barney without the agreement that they would be handled by the individuals and the allocations previously mentioned and in spite of the Defendant's fiduciary relationship with the Plaintiff customer, the Defendant fabricated phony and fraudulent excuses for their willful and malicious failure and refusal to properly handle the Plaintiffs' assets in accord with the Plaintiffs' directions.

39. The Defendant engaged in an intentional malicious effort to cover up the failure to properly handle the Plaintiffs' money with the result that over $300,000.00 worth of the

Plaintiffs' money was squandered.

40. The Defendants were actively working against the best interests of the Plaintiffs for the purposes of increasing their profits and engaged in behavior to create a false appearance that the Plaintiffs' assets were being personally managed by the previously mentioned representatives.

41.  The Defendants failed to provide the Plaintiff with a full and complete accounting of their activities or any records relating to the program initiated by the Defendants to invest the Plaintiffs' assets.

42. The Defendant's handling of the Plaintiffs' assets constituted a scheme, device or artifice to defraud, as well as a practical course of conduct that operated as a fraud or deceit against the Plaintiffs and constitute violations of the Rules of the National Association of Security Dealers.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants in excess of $50,000.00 in general damages and in excess of $50,000.00 in punitive damages.

## SECOND CAUSE OF ACTION

## COMMON LAW FRAUD

43. The Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 42 above as if fully set forth herein.

44. The Defendants concealed their involvement in the manipulation of the Plaintiffs' assets and the allocation of those assets.

45. The Defendants were engaging in a course of conduct described in this Complaint for the intent of failing to provide to the Plaintiffs relevant information that they had a duty to disclose to the Plaintiffs.

46. Had the Plaintiffs known the truth of the Defendant's manipulation of their assets they would not have placed those assets with the Defendant.

47. As a direct and proximate result of the Common Law Fraud as set forth above and in the preceding paragraphs the Plaintiffs have sustained general damages in excess of $50,000.00 and demand punitive damages in excess of $50,000.00.

48. As a direct and proximate result of the Common Law Fraud as set forth above the Plaintiffs have been required to engage in the legal process and have incurred costs and expenses.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants in compensatory damages in excess of $50,000.00 and punitive damages in excess of $50,000.00.

## THIRD CAUSE OF ACTION
## CONVERSION

49. The Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 48 as if fully set forth herein.

50. The Defendants intentionally exercised dominion over the Plaintiffs' property in such a manner as to seriously interfere with the Plaintiffs' right to own, possess and control their assets. The Defendants destroyed the substantial value of the Plaintiffs' assets.

51. The Defendants participated in a scheme to exercise control over the Plaintiffs' assets for the Defendant's financial benefit.

52. The Defendants consistently invested the Plaintiffs' funds in inferior assets some of which the Defendant had investment banking relationships with and the Defendant failed to direct the Plaintiffs' assets into better alternatives solely to obtain undisclosed fees and improve the banking relationship.

53. As a direct and proximate result of the conversion of the Plaintiffs' assets the Plaintiffs' have suffered substantial damages.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants in excess of $50,000.00 in general damages and in excess of $50,000.00 in punitive damages.

## FOURTH CAUSE OF ACTION
### NEGLIGENCE

54. The Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 through 53 above as if fully set forth herein.

55. The Defendant had a duty, including a fiduciary duty, to comply with all laws, rules and regulations relating to their respective relationships with the Plaintiffs and the Plaintiff's respective rights to their securities. The Defendant's owed a duty to the Plaintiffs to take prompt steps to properly invest the Plaintiffs' assets and to report to the Plaintiffs on the nature and extent of those investments.

56. The Defendant through its nationwide network of advisors purportedly provides objective financial advisory services in investments and advise to clients based on their individual needs and the Defendant failed and refused to provide this service.

57. The Defendant improperly steered the Plaintiffs' assets away from the appropriate managers and invested those assets in inferior stocks in an inferior fashion, and failed to increase those assets in better alternatives.

58. The Plaintiffs were harmed because they placed in custody with the Defendant a significant amount of money in exchange for the Defendant providing Plaintiffs with individual portfolio management as previously mentioned; instead the Defendant pushed the Plaintiffs' assets into poorly performing securities without the knowledge or consent of the Plaintiffs and thereafter refused to account to the Plaintiffs for the management and deployment of the assets, making false and misleading representations to the Plaintiffs.

59. The Plaintiffs allege that the unreported commissions were used as incentive payments for Salomon, Smith, Barney investment advisors with the intent of preventing the Plaintiffs from being in a position to make a fully informed investment decision.

60. The Defendants failed to provide and respond to the Plaintiffs with a true and accurate accounting of their assets and intentionally attempted to deceive the Plaintiffs.

61. The Defendant on being placed on notice of suspicious circumstances failed to properly investigate the Plaintiffs claims and failed to provide the Plaintiffs with proper accounting for the circumstances or their assets.

62. The Defendant had the highest duty of care to the Plaintiffs as a result of their position as trustee and fiduciary and failed to comply with these obligations.

63. The Defendants failed to comply with the reasonable commercial standards for fair dealing within the security industries with the Plaintiffs.

64. The Defendants engaged in conduct which constitutes negligence and manipulative

activity and which severely damaged the Plaintiffs' assets and the investment of their assets.

65. The Defendants regularly provided the Plaintiffs and other customers with promises of unbiased investment research and analysis and appropriate placement of their funds and based on these promises artificially increased the fees charged to the Plaintiffs in relation to discount brokers.

66. The pervasiveness of the Defendant's improper conduct has become clear based on fines assessed against the Defendant by the National Association of Securities Dealers for their materially misleading individuals and the Plaintiffs, and based on the fact that the New York State Attorney General has filed a civil complaint against the Defendant and based on the fact that the Securities and Exchange Commission has investigated the Defendant.

67. The Defendant repeatedly suggested that the Plaintiffs were "in the best possible hands for a brokerage house with strong work ethic and commitment to building relationships based on trust and professionalism" and that their objective was to help the Plaintiffs invest wisely and that they had intimate relationships with the companies with which they invested the Plaintiffs' assets when, in fact, the Defendant was influenced by the investment banking relationships they had with these companies to the detriment of the Plaintiffs' assets.

68. The Defendant engaged in conduct that constituted conflict of interest by investing Plaintiffs' assets in companies with which it had an investment banking relationship and allowing these companies to exercise influence over the Defendant and on the advise regarding investment of the Plaintiffs' assets.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants in an amount in excess of $50,000.00 in actual damages and in excess of $50,000.00 in punitive damages

## FIFTH CAUSE OF ACTION

## BREACH OF CONTRACT

69. The Plaintiffs repeat and re-allege the allegations contained in Paragraphs 1 though 68 above as if fully set forth herein.

70. The Plaintiffs contracted with the Defendant to invest their funds with an individual managed account, as previously specified, under the auspices of three particular portfolio managers: Richard Freeman, Larry Weissman and Hirsch Cohen and at a specified percentage of assets for each: 25%, 35% and 40%, respectively.

71. The Plaintiffs paid specific fees set up for those investments.

72. The Defendant failed to provide the desired investment and mislead the Plaintiffs with the intent to curry favor with the Defendant's existing and potential investing banking clients.

73. The Defendant had a duty of good faith and fair dealing to comply with the Plaintiffs' contractual arrangement and failed to do so, thereby destroying or injuring the Plaintiffs' rights and assets.

74. As a direct and proximate result of the Defendant's breach of contract with the Plaintiffs and the Defendant's breach of the covenants of good faith and fair dealing, the Plaintiffs have incurred damages in excess of $50,000.00.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants in an amount in excess of $50,000.00.

## SIXTH CAUSE OF ACTION

## BAD FAITH CONDUCT

75. The Defendant is in the business of buying, selling or clearing or otherwise dealing with securities.

76. The Defendant provides individual investors with portfolio management and stock brokerage services and provides corporate clients with investment banking services. It is critical that the Defendants research and analysis concerning a particular company not be influenced by investment banking services that the firm actually or potentially provides to the same company.

77. The Defendant failed to insure that the portfolio management of the Plaintiffs' assets and the analysis provided to the Plaintiffs by the Defendant was not influenced by the Defendant's investment banking operations. In fact, in an effort to curry favor with actual and potential investment banking clients, Defendant encouraged its analysts to produce biased research reports and analysis that artificially inflated the ratings and outlook of investment banking clients.

78. The Defendant's conflict of interest is highlighted by it's dealings in the telecommunications area where the Defendant had placed, or held,  some of the Plaintiffs' assets. The Defendant collected at least 1.8 Billion dollars in investment banking fees from telecommunications clients at the same time the Defendant's Star Telecommunications analyst, Jack Grubman, provided Defendant's brokerage customers with misleading biased and overly optimistic analyst reports concerning these same telecommunication clients. Grubman's analysis and expertise of the telecommunication industry was presented to the Defendant's

brokerage customers as objective, unbiased and otherwise first rate. Unbeknownst to the Plaintiffs, Grubman, working in partnership with the Defendant's investment bankers was directly and personally involved in Defendant's efforts to obtain investment banking business from the same telecommunication companies that he analyzed and that the Defendant held in the Plaintiffs' accounts.  Grubman's $20,000,000.00 annual salary was directly charged to the investment banking revenues. Grubman's misleading, biased and overly optimistic opinions were relayed to the Plaintiffs on conference calls and were utilized in the handling of their assets.

79. When questioned in the year 2000 concerning the apparent conflict of interest between his dual role within Defendant's and investment banking and equity analysis operations, Grubman, speaking on behalf of himself and the Defendant, boasted "What used to be a conflict is now a synergy." In contrast to this public boasting Grubman, in an internal email, acknowledged that "If anything the record shows we support our banking clients too well and too long."

80. Defendant's conduct and action are not in accordance with reasonable commercial conduct and the Defendant did not provide appropriate information to the Plaintiffs according to proper request and instruction from the Plaintiffs.

81. The Defendant misrepresented the true facts regarding the Plaintiffs' account and falsely and deceitfully provided inaccurate information to the Plaintiffs.

82. The Defendant breached its duty to provide Plaintiffs with full and accurate and complete material information regarding their investments and made intentionally and/or negligent false declarations.

83. The Defendant's conduct was outrageous and manifested a complete indifference to

and conscious disregard for the best interests of the Plaintiffs and was in reckless disregard of the Plaintiffs' rights with full realization by the Defendant of the probable results and damages arising from their misconduct.

84. The actions of the Defendant constituted a conflict of interest and breach of duties in its custodial depository fiduciary relationship with the Plaintiffs.

85. The Defendant failed to take all actions necessary to protect the integrity of the Plaintiffs' accounts and records. In fact, it communicated with other brokerage houses motivated by greed and profit.

WHEREFORE, the Plaintiffs demand Judgment against the Defendants in amount in excess of $50,000.00 in actual damages and an amount in excess of $50,000.00 in punitive damages.

## SEVENTH CAUSE OF ACTION
## DECEPTIVE TRADE PRACTICES

86. The Plaintiffs re-allege the allegations contained in Paragraphs 1 through 85 hereof as though fully set forth herein.

87. The conduct of the Defendant and each of their agents constitutes a deceptive trade practice as defined in NRS Chapters 598.

88. Upon information and belief, the Defendants did not use due care and diligence or observe reasonable commercial standards in the performance of their duties as are common in the brokerage business for security accounts.

89. The Defendant breached their duty to cooperate and provide the Plaintiffs with appropriate and necessary information regarding the management of their assets.

90. The Plaintiffs are entitled to immediate accounting from the Defendants for the management, use and deployment of their assets.

91. The Defendant's conduct is in violation of the unfair trade practices and consumer protection law.

WHEREFORE the Plaintiffs demand general damages in excess of $50,000.00 from the Defendants, special damages as proven at trial, punitive damages in excess of $50,000.00, reasonable attorney's fees, costs and expenses in the investigation, preparation and litigation of this action for cost of suit and statutory interest.

RESPECTFULY SUBMITTED:

BYRNE, NEYHART & HIGGINS

S/ John J. Byrne, Esquire

John J. Byrne, Esquire

1803 Sanderson Avenue

Scranton, PA  18509

(570) 343-2480

ATTORNEY FOR PLAINTIFFS